**Alwilda WALTER, and Fort Wayne National Bank, Guardian of the Estate of Alwilda Walter, Appellants–Defendants,**

v.

**Mark S. BALOGH, Diana L. Balogh, Barry Hoeppner & Janet Hoeppner, Appellees–Plaintiffs,**

**and**

**Howard Hoeppner and B & H Producers, Inc., Appellees– Third Party Defendants.**

**No. 57A05–9112–CV–400.[1]**

Court of Appeals of Indiana, First District.

Dec. 22, 1992.

Rehearing Denied Feb. 19, 1993.

**1.** This case was transferred to this office on    November 5, 1992 by order of the Chief Judge.

Eric E. Snouffer, Charles W. McNagny, Fort Wayne, for appellants-defendants.

John M. Haecker, Grimm & Haecker, Edward L. Murphy, Jr., Miller Carson & Boxberger, Fort Wayne, Edward J. Liptak, Miller Carson & Boxberger, Bloomington, for appellees-plaintiffs.

ROBERTSON, Judge.

Alwilda Walter, and the Fort Wayne National Bank, Guardian of the Estate of Alwilda Walter, appeal the judgment after a bench trial in favor of Mark and Diana Balogh, Barry and Janet Hoeppner, Howard Hoeppner, and B & H Producers, Inc. Walter raises three (3) issues on appeal. We reverse and remand with instructions, addressing two (2) restated and consolidated issues.

### FACTS

The facts in the light most favorable to the trial court's judgment indicate that Alwilda Walter was seventy-nine (79) years old in 1983 when her husband, Martin, died. Martin and Alwilda never had children. They were quite wealthy and owned approximately 1200 acres of farmland. After Martin's death, Alwilda was left rich in land and money, yet impoverished in terms of human companionship and relationships.

Howard Hoeppner had been a close friend of the Walters for many years. He had been quite helpful to the Walters, having performed many services and favors for them. After Martin's death in 1983, Alwilda executed a Durable General Power of Attorney naming Howard Hoeppner as her attorney-in-fact. Alwilda also named Howard as the personal representative of her estate under her will executed in 1983. The residuary clause of this will left the vast majority of Alwilda's estate, including several valuable farms, to the Purdue Alumni Foundation and Trust to be held and administered as part of the Purdue Agricultural Alumni Trust for scholarships and educational purposes.

Howard Hoeppner's son, Barry, became a tenant farmer of the Walters in 1974. Over time, Barry and his business partner, Mark Balogh, became responsible for farming approximately 600 acres of the Wal-

ters' land. Barry and Mark operated their farming business as B & H Producers. Barry and Mark also formed a close friendly relationship with Alwilda. Alwilda depended upon Barry and Mark to bring her mail to her, take care of her dog, look after her oil furnace, run errands, and furnish companionship.

Alwilda decided to give substantial farm holdings to the tenant farmers who had farmed her land over the years. She decided to give Bruce and Minnie Provine the 285 acres they had farmed since 1957. The Provines are not involved in this litigation. Alwilda also wished to give approximately 600 acres to Mark Balogh and Barry Hoeppner, ultimately the subject of the instant litigation.

In order to minimize federal gift tax liability, the intended gifts to the Provines, Baloghs, and Hoeppners, were structured as contracts for the conditional sale of real estate (land contracts). For the purpose of reporting 1984 gift taxes, the value of these gifts was to have been calculated by computing the difference between the value of the real estate in question and the contract prices which were set far below their fair market values. On March 29, 1984, the land contract pertaining to the 600 acres which were to be given to the Baloghs and Hoeppners was executed. The contract price of this real estate was set at $250,000.00. Thereafter, in order to minimize gift tax liability, Alwilda intended to forgive contract indebtedness over time, constituting further gifts to the plaintiffs. It was intended that Alwilda would forgive the amount of $10,000.00 per person per year, ($40,000.00 per year to the two couples), matching the annual gift tax donee exclusion under federal gift and estate tax provisions in order to avoid gift tax liability. The contract provided that at Alwilda's death, all amounts still owing under the contract would be forgiven, resulting in the transfer of ownership of the farms to the Baloghs and Hoeppners.

The 600 acre farm appraised for $596,-000.00. In March of 1985, Jeanne Miller, the attorney who was handling these transactions, became concerned about the gift tax consequences of the 1984 land contract. She determined that the substantial difference between the value of the farm and the contract price ($596,000.00 – $250,000.00 = $346,000.00) would exhaust Alwilda's unified gift and estate tax credit and result in approximately $49,000.00 in gift tax liability for the year of 1984 alone. Miller suggested that the transaction be restructured in order to avoid these gift tax consequences.

Without objection, all parties agreed to rescind the 1984 land contract and enter into a promissory note and mortgage arrangement. The stated purchase price for the 600 acre farm was increased to $500,-000.00. The Baloghs and the Hoeppners each executed a note in favor of Alwilda in the amount of $250,000.00 with interest set at 9%. The notes called for payments of $20,000.00 per year from both the Baloghs and the Hoeppners ($40,000.00 per year total), which were intended to be forgiven by Alwilda, matching the annual gift tax donee exclusion. Under this arrangement, the Baloghs and the Hoeppners were obligated to pay the property taxes on the real estate. The description of the real estate was amended to exclude Alwilda's residence which had inadvertently been included in the real estate to be conveyed under the 1984 contract. As a part of this restructuring arrangement, Alwilda executed the Second Codicil to her will which contained the provision regarding the forgiveness of remaining debt upon her death. The restructuring of the transaction reduced (or perhaps eliminated) any federal gift or estate tax liability that could have arisen out of the transaction. However, the $40,000.00 annual forgiveness of ·debt was insufficient to satisfy the interest accruing on the notes; 9% of $500,000.00 = $45,000.00 per year.

Alwilda made several other gifts to the Provines, Baloghs, and Hoeppners over the years. In 1984, she pledged some of her real estate as collateral in order that the

Baloghs and Hoeppners could obtain an increased line of credit. Also in 1984, she gave cattle, and grain worth over $40,-000.00 to the Baloghs and the Hoeppners. After the arrangement was restructured in 1985, Alwilda continued to pay the real estate taxes on the farm even though the Baloghs and Hoeppners were obligated to do so. (The Baloghs and the Hoeppners nevertheless deducted these taxes as expenses on their federal income tax returns.) In August of 1985, Alwilda released her mortgage as to approximately seven acres of land in order that B & H Producers could obtain a $43,000.00 loan. In February of 1987, she loaned B & H Producers $25,000.00 cash and later forgave the debt.

Alwilda was concerned about being required to execute so much paperwork when all she wanted to do was give the farm to the Baloghs and the Hoeppners. She was afraid that she might forget to forgive the indebtedness owed under the notes to effect her gift-giving intent. In 1986, Alwilda executed a durable special power of attorney (as well as another general power of attorney) in favor of Howard Hoeppner which gave him the authority to give gifts up to $10,000.00 per year to the Baloghs and the Hoeppners ($40,000.00 per year).

In June of 1988, Alwilda, then age 84, started becoming confused and forgetful. Alwilda's niece, Ellen Bates, became involved in Alwilda's financial affairs. Alwilda appointed Bates as her attorney-in-fact and revoked Howard Hoeppner's 1983 power of attorney. (Howard's 1986 powers of attorney remained in effect). Alwilda also executed the Seventh Codicil to her will which, in part, revoked the provision in her Second Codicil which related to the forgiveness of the balance of the Baloghs' and the Hoeppners' indebtedness under the 1985 promissory notes upon Alwilda's death.

On August 1, 1988, a guardianship was established over the Estate of Alwilda Walter and the Fort Wayne National Bank [Bank] was appointed as Alwilda's guardian. On August 23, 1988, Balogh and Hoeppner filed a request for special notice of hearings in Alwilda's guardianship proceedings alleging that they were entitled to such special notice as mortgagors. On August 26, 1988, Howard Hoeppner filed a petition in the guardianship proceedings requesting the court to adjudicate Alwilda's competency.

As Alwilda's guardian, the Bank issued a Notice of Default to the Baloghs and the Hoeppners with respect to their obligations under the 1985 mortgages. The Hoeppners and the Baloghs filed the present action for declaratory judgment requesting the trial court to enter a judgment to the effect that the 1985 notes and mortgages were null and void and that the 1984 land contract was binding and enforceable. Alwilda and the Bank answered the complaint asserting duress, undue influence, failure of consideration, no consideration, and estoppel. Alwilda and the Bank also filed a counterclaim naming Howard Hoeppner as a third party defendant and sought the rescission of the transactions in question, an accounting, and damages; or in the alternative, a foreclosure of the mortgages.

Trial was held over four (4) days. On September 3, 1991, the trial court entered its Decision, Findings of Fact, Conclusions of Law, and Judgment which, reproduced in an appendix to the appellants' brief, spans sixteen (16) pages. In pertinent part, the trial court found and concluded as follows:

> The Court concludes that the evidence adduced at the trial of this cause makes it clear that Alwilda Walter was a competent person who understood that she was giving away valuable land and large sums of money to the Plaintiffs, but did so willingly, intentionally and with full understanding of exactly what she was doing. The evidence indicates that neither the Plaintiffs nor Howard Hoeppner forced or pressured her into making gifts to the Plaintiffs and that Howard Hoeppner did not violate his fiduciary obligation to her with regard to any of these gifts.

> The Court further concludes that in light of the uselessness of material

wealth to Alwilda Walter at the time these gifts were made and the close relationship that had developed between her and the Plaintiffs, it was quite understandable and reasonable for her to have made them.

It is the Court's position, therefore, that all of the gifts made by Alwilda Walter to the Plaintiffs delineated during the trial of this cause were knowingly and intentionally made by her at a time when she was fully competent to make them and were not the product of undue influence, duress, coercion or the violation of any fiduciary obligation Howard Hoeppner may have had toward her. The gifts were, then, legal and binding and fully vested in the Plaintiffs at the times of their acceptances of them.

It has been suggested that with regard to the gift of real estate, the original structuring of this gift and the subsequent restructuring of it so as to minimize Alwilda Walter's gift tax liability resulted in its full or partial failure. This is a position the Court rejects on two grounds. First, as more fully explicated in the Court's findings of Fact and Conclusions of Law which follow, the gift was complete upon the first transfer and nothing done subsequent to that transfer changed this fact. Second, . . . . This case is in equity. 'Once equity assumes jurisdiction for one purpose, it assumes jurisdiction for all purposes and disregards formalities which might bar the accomplishment of a complete result.'

With this conclusion the Court heartily agrees. Even if one were to assume, therefore, that there existed some technical or formal legal flaw in Alwilda Walter's scheme to give the Plaintiffs the real estate in question while minimizing her gift tax liability such that the gifts failed to legally vest, equity must step in and accomplish the result intended by Alwilda Walter. For this Court, sitting as a Court of Equity, to do less would clearly make a mockery of Alwilda Walter's intent and thwart her goal as to the transfer of the real estate in question to the Plaintiffs.

Since it is clear to the Court that there exists no question that Alwilda Walter fully intended to and, in fact, did transfer the real estate and other gifts to the Plaintiffs but attempted to do this so as to minimize her gift tax liability, if it is determined by the Internal Revenue Service or the Indiana Department of Revenue that there is any tax penalty or interest owing with regard to these gifts, and such tax, penalty or interest shall be paid by the guardian of Alwilda Walter's estate.

\*. \* \* \* \*. \*

## Conclusions of Law

1. The Court has jurisdiction of the subject matter and the parties in this cause.

2. In 1984, Alwilda Walter made a gift of the real estate [in question] to the plaintiffs. This gift became fully vested in the Plaintiffs at the time it was made.

3. In order to structure the gift so as to minimize her gift taxes, Mrs. Walter executed a Contract for the Conditional Sale of Real Estate on March 29, 1984. For tax purposes, the gift in 1984 would be calculated by the difference between the value of the real estate and the contract price. Thereafter, Alwilda Walter's subsequent forgiveness of contract indebtedness would have constituted further gifts to the plaintiffs.

4. Howard Hoeppner did not violate any fiduciary obligation he had to Alwilda Walter with regard to any gifts he made to the Plaintiffs.

5. Since there was no undue influence or duress exerted by anyone upon Alwilda Walter and the 1984 contract was her voluntary and knowing act and deed, the contract was valid and enforceable.

6. In attempting to avoid the possibility of substantial gift taxes for Alwilda Walter for 1984, Jeanne Miller restructured the gift to the plaintiffs. The re-

structuring of the 1984 contract and the execution of the 1985 instruments were conditioned upon Alwilda Walter's execution of the Second Codicil to her will, containing the forgiveness of debt upon her death, as well as her agreement to continue forgiving debt owed by the plaintiffs under the promissory notes.

7. The special power of attorney executed by Alwilda Walter in favor of Howard Hoeppner on April 14, 1986, authorizing him to make gifts of $10,000.00 per year to each of the plaintiffs and to Bruce and Minnie Provines, was a durable power of attorney which was not affected by Alwilda Walter's subsequent incapacity. Presently, Howard Hoeppner retains the power to make gifts because no revocation has occurred.

8. Alwilda Walter's revocation of the Second Codicil to her Last Will and Testament was a failure of the consideration for the 1985 promissory notes and mortgages. The 1985 transactions were rendered invalid by that revocation. Consequently, the 1984 real estate contract between the plaintiffs and Alwilda Walter was reinstated as of June 1, 1988.

9. Since it was the original intent of Alwilda Walter to give the real estate to the plaintiffs as an outright gift, the Court concludes that its determination concerning the reinstatement of the 1984 real estate contract should be made so as to minimize gift taxes for Alwilda Walter, but to fulfill her original intention of making an outright gift of the real estate to the plaintiffs....

[The Court then sets out the manner in which the transfer of the real estate should be reported to minimize gift tax liability and orders that Alwilda pay any gift taxes which may result upon the transfer of the real estate.]

In its original judgment, the trial court ordered Alwilda and her guardian to convey the real estate in question by quit-claim deed to the Baloghs and Hoeppners. On October 25, 1991, the trial court amended its judgment and found that Alwilda and

the Bank were not required to execute quit-claim deeds but instead, the trial court ordered them to release the mortgages held on the real estate.

## DECISION

Our review of the trial court's judgment is governed by Ind. Trial Rule 52. The purpose of making special findings is to provide parties and reviewing courts with the theory upon which the judge decided the case so that the right of review might be preserved effectively. *Willett v. Clark* (1989), Ind.App., 542 N.E.2d 1354; *Sandoval v. Hamersley* (1981), Ind.App., 419 N.E.2d 813, *trans. denied.* Generally, special findings should contain all facts necessary for a judgment for the party in whose favor the conclusions of law are found. *Id.* Although the trial court need not recite the evidence in detail, the findings should contain all necessary ultimate facts. *Id.* Whether special findings are adequate depends upon whether they are sufficient to disclose a valid basis under the issues for the legal result reached in the judgment. *Willett,* 542 N.E.2d at 1357. On appeal, we construe the trial court's findings together liberally in support of the judgment; however, we may not add anything to the special findings of fact by way of presumption, inference, or intendment. *Sandoval,* 419 N.E.2d 813. We apply a two-tiered standard of review to special findings entered by the trial court. *Department of Public Welfare v. Couch* (1992), Ind.App., 585 N.E.2d 1337. First, we determine whether the evidence supports the findings: second, we determine whether the findings support the judgment. *Id.* Special findings and the judgment which rests upon those findings will be set aside only if they are clearly erroneous in that the record is devoid of facts or inferences to support the findings, or that the judgment is unsupported by the findings. *Id.* In reviewing the trial courts entry of special findings, we neither reweigh the evidence nor reassess the credibility of witnesses. *Flansburg v. Flansburg* (1991), Ind.App., 581 N.E.2d 430, *trans. denied.*

## I.

Whether Howard Hoeppner sufficiently rebutted, by clear and unequivocal proof, the presumption arising from his fiduciary relationship with Alwilda that the alleged gifts were the product of undue influence?

Alwilda and the Bank sought the rescission of the transactions in question and the return of all property transferred to the Baloghs and the Hoeppners based on the allegation that the transfers of property in question were the product of undue influence practiced upon Alwilda by Howard Hoeppner. In Indiana, certain legal and domestic relationships raise a presumption of trust and confidence as to the subordinate party on the one side and a corresponding influence on the other. *Lucas v. Frazee* (1984), Ind.App., 471 N.E.2d 1163; *Hunter v. Milhous* (1973), 159 Ind.App. 105, 305 N.E.2d 448. These relationships include that of attorney and client, guardian and ward, principal and agent, pastor and parishioner, husband and wife, and parent and child. *Id.*

█ In such cases, if the plaintiff's evidence establishes (a) the existence of such a relationship, and (b) the questioned transaction between those parties resulted in an advantage to the dominant person in whom trust and confidence was reposed by the subordinate, the law imposes a presumption the transaction was the result of undue influence exerted by the dominant party, constructively fraudulent, and thus void. *Lucas*, 471 N.E.2d 1163. At that point, the burden of proof shifts to the dominant party who then must demonstrate the questioned transaction was in fact one had at arms length and thus valid. *Id.* Moreover, in such cases, the dominant party must rebut the presumption of fraud by clear and unequivocal proof. *Id.* On review of such cases when judgment is entered against the subordinate party (as in the case at bar), we review not only the question of whether the judgment is contrary to law, but also whether the domi-

nant party's evidence is sufficient to sustain the judgment under the clear and unequivocal proof standard. *Id.*

In the present case, the power of attorney in Hoeppner created a fiduciary relationship between Howard and Alwilda. *Hunter*, 305 N.E.2d 448. Moreover, without question, this fiduciary relationship combined with the transfer of real property to Howard's son without consideration gives rise to a presumption of undue influence and against the validity of the deeds effecting the transfer. *Id.*

█ The trial court specifically found that the questioned transactions were not the product of undue influence and that Howard did not violate any fiduciary obligation owed to Alwilda. The trial court found further that the 1984 land contract was Alwilda's voluntary and knowing act and deed and that she made the gifts willingly, intentionally, and with full understanding of exactly what she was doing.

Despite the voluminous nature of the trial court's findings, we cannot discern whether the trial court correctly followed the law as set out above. We cannot tell if the trial court imposed the presumption, prescribed by law under the present circumstances, that the questioned transactions were void as the result of Howard's undue influence. Nor can we tell whether the trial court applied the clear and unequivocal proof standard that Howard was required to meet in order to rebut the presumption.

Under the more stringent standard of review imposed by T.R. 52, the trial court's findings are insufficient to effectively preserve the right of review. In this situation, we may grant the same relief that a trial court may grant in a motion to correct error. *Cunningham v. Hiles* (1980), Ind. App., 402 N.E.2d 17, *trans. denied.* Trial Rule 52(B) provides that a trial court may open the judgment and take additional testimony, amend or make new findings or fact, enter a new judgment, or any combination of these, if the special findings of

fact are lacking, incomplete in form or content or do not cover the issues raised by the pleadings or evidence. Therefore, we reverse and remand with instructions that the trial court make specific findings of fact sufficient to disclose the basis for its judgment with respect to this issue and, if necessary, modify its judgment accordingly.

## II.

Whether the trial court exceeded its equitable jurisdiction by ordering the completion of the intended inter vivos gifts of land?

■■■■■ The *law* is well-settled: a gift inter vivos occurs when:

1. the donor is competent to contract;

2. the donor has freedom of will;

3. the donor intends to make a gift;

4. the gift is completed with nothing left undone;

5. the property is delivered by the donor and accepted by the donee;

6. the gift is immediate and absolute.

*Lucas*, 471 N.E.2d at 1168. To make a valid inter vivos gift there must be both an intention to give and a stripping of the donor of all dominion or control over the thing given and there must be an irrevocable change of title. *Rogers v. Rogers* (1982), Ind.App., 437 N.E.2d 92. An intention or promise to make a gift effective in the future is void as being without consideration. *Hopping v. Wood* (1988), Ind. App., 526 N.E.2d 1205, *trans. denied.* An instrument reciting a promise to make gifts over time is executory in nature, lacks consideration, and cannot be enforced as a valid gift inter vivos. *Brown v. Addington* (1944), 114 Ind.App. 404, 52 N.E.2d 640. An agreement to convey land for no consideration on a date in the future does not constitute a completed gift which goes into immediate and absolute effect and is insufficient to demonstrate a gift inter vivos. *Larabee v. Booth* (1982), Ind.App., 437 N.E.2d 1010.

In the present case, Alwilda intended to give the 600 acre farm to the Baloghs and the Hoeppners. However, there is no dispute that the transfer of the property was to take place over time in order to minimize gift tax liability. The gift was structured as a sale at below market price: the remaining indebtedness to be forgiven at a rate corresponding with Alwilda's annual gift tax exclusion. The trial court found "[i]t was intended that both interest payments and the principal balance of the contracts *could be forgiven* by Mrs. Walter ..." (Finding of Fact # 10; emphasis added.) The trial court concluded "subsequent forgiveness of contract indebtedness *would have constituted further gifts* to the plaintiffs." (Conclusion of Law # 4, emphasis added). Even the Baloghs and Hoeppners concede that Alwilda did not intend to make a present, completed gift to them, they assert "Mrs. Walter *would* have made an outright gift of the land if she had not been faced with paying federal gift taxes as a result of such a gift." (Appellee's brief p. 40; emphasis added.)

■■■■ While Alwilda did make substantial gifts to the Baloghs and the Hoeppners over the years, the transfer of the real estate in question was never completed. Alwilda was never entirely stripped of dominion or control over the property; an irrevocable change of title was never completed. Under the 1984 land contract, the property was to transfer to the plaintiffs at Alwilda's death, when any remaining indebtedness was to be forgiven. (Finding of Fact # 10). Under the 1985 restructuring, Alwilda retained mortgages securing the remaining indebtedness on the real estate. Therefore, the trial court's conclusion that the gift of land was completed and fully vested in the plaintiffs is clearly erroneous.

■■■■ The trial court exceeded its equitable jurisdiction when it invoked equity to order Alwilda and her guardian to release the mortgages held on the real estate to give effect to Alwilda's earlier intention to give the land to the Baloghs and the Ho-

eppners. As a general proposition, equity delighteth in the law, and equity follows the law. *Smith v. Sparks Milling Co.* (1942), 219 Ind. 576, 39 N.E.2d 125. Resorting to hornbook authority:

A court of equity has no more right than has a court of law to act on its own notion of what is right in a particular case; it must be guided by the established rules and precedents.... Where rights are defined and established by existing legal principles, they may not be changed or unsettled in equity.... Equitable principles are subordinate to positive institutions and cannot be applied either to subvert established rules of law or to give the courts a jurisdiction hitherto unknown.

27 Am.Jur.2d *Equity* § 118 at pp. 644, 645 (1966).

We can hardly imagine an area of law which is better settled than the law pertaining to the requirements for making a valid inter vivos gift; requirements which clearly have not been met in the present case. While we respect the trial court's desire to fulfill Alwilda's earlier expressed intention to give the land to the plaintiffs, we hold that the trial court's subversion of the well-established law governing this area constitutes an excess of the trial court's equitable jurisdiction.

■ Moreover, the trial court's conclusion that the rescinded 1984 land contract governs the parties' rights is clearly erroneous. (The trial court had concluded that the 1985 restructured arrangement was rendered invalid, and the 1984 land contract reinstated, based upon Alwilda's revocation of the Second Codicil to her will in which the remaining indebtedness would have been forgiven upon her death.) (Finding of Fact # 8) Alwilda's promises to make gifts in the future under either the 1984 land contract or the 1985 restructured arrangement were executory agreements unsupported by consideration and were unenforceable. *See, Hopping*, 526 N.E.2d 1205; *Brown*, 52 N.E.2d 640, *Larabee*, 437

N.E.2d 1010. The agreement to make gifts in the future under the 1984 land contract was never enforceable and could not be somehow revived and rendered enforceable by Alwilda's breach of her similarly unenforceable promise to make gifts in the future under the 1985 restructured agreement.

■ There is no dispute that the parties mutually consented to rescind the 1984 land contract in order to restructure the transaction and minimize Alwilda's gift tax liability. Parties to a contract may rescind the contract by mutual consent at any stage of performance. *Economy Leasing Co., Ltd. v. Wood* (1981), Ind.App., 427 N.E.2d 483. Rescission of a contract by mutual agreement terminates the parties' rights and duties under the contract. *Id.* The function of contract rescission is to return the parties to their pre-contract position, that is, the status quo. *Horine v. Greencastle Production Credit Ass'n* (1987), Ind.App., 505 N.E.2d 802, *trans. denied.*

■ We can see no impediment to the parties' ability to mutually consent to a rescission of the 1984 land contract and its replacement with the 1985 agreement. After all, as stated throughout this opinion, Alwilda's promises to make gifts in the future were entirely unenforceable. We can understand why the Baloghs and the Hoeppners would be amenable to the rescission of the 1984 land contract and its 1985 restructuring—it is not wise to look a gift horse in the mouth.

The rescission of the 1984 land contract effected by mutual consent terminated the parties' purported rights and duties under that contract and returned them to their pre-contract position. The parties' present rights are governed by the 1985 restructured arrangement under which Alwilda's promises to make gifts in the future and at her death are entirely unenforceable. The mortgages which secure the remaining indebtedness on the real estate in question are valid.

## CONCLUSION

As set out under Issue I, we remand with instructions that the trial court make specific findings of fact sufficient to preserve the right of review regarding the issue of whether Howard Hoeppner rebutted, by clear and unequivocal proof, the presumption that the challenged transactions were the product of undue influence. And, if required under its amended findings, the trial court is to modify its judgment accordingly. Should the trial court find that Howard Hoeppner sufficiently rebutted the presumption of undue influence, the trial court is instructed to proceed with the foreclosure of the mortgages.

Judgment reversed.

MILLER and BARTEAU, JJ., concur.